IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

MICHAEL O'NEAL HUTCHINS, §
§
Petitioner, §
§
v. § Civil Action No. 4:16-CV-205-O
§
LORIE DAVIS, Director, §
Texas Department of Criminal Justice, §
Correctional Institutions Division, §
§
Respondent. §

## **OPINION AND ORDER**

Before the Court is a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by petitioner, Michael O'Neal Hutchins, a state prisoner confined in the Correctional Institutions Division of the Texas Department of Criminal Justice (TDCJ), against Lorie Davis, director of TDCJ, Respondent. After considering the pleadings and relief sought by Petitioner, the Court has concluded that the petition should be denied.

## **I. BACKGROUND**

In April 2011, a jury found Petitioner guilty of aggravated robbery with a deadly weapon in Tarrant County, Texas, Case No. 1147257D, found the habitual-offender notice in the indictment true, and sentenced Petitioner to 49 years' confinement. Clerk's R. 132, ECF No. 18-10. Petitioner appealed his conviction, but the Second District Court of Appeals of Texas affirmed the trial court's judgment and the Texas Court of Criminal Appeals refused Petitioner's petition for discretionary review. Docket Sheet 1-2, ECF No. 18-2. Petitioner also filed a postconviction state habeas-corpus application challenging his conviction, which was denied by the Texas Court of Criminal Appeals without written order on the findings of the trial court. Action Taken, ECF No. 18-25.

At trial, Miguel Correa, a night assistant at a QuikTrip store in Arlington, Texas, testified that on February 9, 2009, a man robbed him at gunpoint. Reporter's R., vol. 3, 15-18, ECF No. 18-7. Although Correa could describe the clothing the man wore, he could not identify Petitioner as the man who robbed him in a photo lineup or at trial. *Id.* at 30-31, 42, 147-48. The police, after investigating a string of robberies in the area, developed Petitioner as a suspect in several robberies in Fort Worth and Arlington, including the QuikTrip robbery. *Id.* at 48. Petitioner gave a recorded statement to the Fort Worth police and to the Arlington police. *Id.* at 49. At trial, a suppression hearing was held outside the presence of the jury regarding the admissibility of his statement to the Arlington police. The state appellate court summarized the evidence presented at the hearing and the trial court's findings on the issue as follows:

### Testimony at Suppression Hearing

Fort Worth police interviewed [Petitioner], who was a suspect in several robberies in Fort Worth. Sometime shortly after the interview, Fort Worth police arrested [Petitioner] on an assault charge. While [Petitioner] was in custody as a result of the arrest, Fort Worth police contacted Sergeant Anthony Wright with the Arlington police department, who was investigating a robbery at a QT convenience store in Arlington. The Fort Worth officers told Sergeant Wright that they had received a tip which led them to suspect that [Petitioner] had been involved in several robberies, including the QT robbery. Sergeant Wright then interviewed [Petitioner] starting around 9 p.m. at the Mansfield Law Enforcement Center. Sergeant Wright taped the interview, during which [Petitioner] waived his *Miranda* rights.

Sergeant Wright testified that he did not know how long [Petitioner] had been in custody when he picked him up from Fort Worth and took him to Mansfield for the interview. Sergeant Wright did not remember what [Petitioner] was wearing, and he did not know whether [Petitioner] had eaten, but he did say [Petitioner] did not appear fatigued. The interview lasted thirty minutes.

Sergeant Wright acknowledged that he started out the interview by telling [Petitioner] that he "had been speaking with Fort Worth, which is initially who identified" [Petitioner] to him. Sergeant Wright showed [Petitioner] photographs and video stills of a couple of robberies in Arlington, including the QT one, but he did

2

not remember showing [Petitioner] photos or video stills of any of the Fort Worth offenses. When Sergeant Wright told [Petitioner] he had done an analysis of "all the videos," he was referring to the two Arlington robberies, but Sergeant Wright had viewed some of the video stills from Fort Worth. . . . Sergeant Wright said that he questioned [Petitioner] about the 7-11 robbery first, then the QT one, but he could not be sure whether [Petitioner] was looking at the 7-11 and QT photos together when he confessed to the QT robbery because all the photos were on the table by that point.

Sergeant Wright testified that he made no promises to [Petitioner], did not coerce [Petitioner], and was not aware of any promises made by Fort Worth police; he told [Petitioner] he did not know about the facts of the Fort Worth cases. Sergeant Wright did not know "anything about [Fort Worth's] investigation." Sergeant Wright admitted that [Petitioner] could have thought during the interview that Sergeant Wright knew everything that Fort Worth police knew about robberies other than the ones in Arlington.

[Petitioner] testified that in the initial Fort Worth interview, the police told him he was under arrest but did not read him his *Miranda* warnings. He thought they told him, however, that he did not have to talk to them, but he was not sure. The Fort Worth interview took place the day before the interview with Sergeant Wright. When asked if he thought the Arlington interview was "in connection with" the Fort Worth interview, [Petitioner] answered he did, "[s]eeing how he [Sergeant Wright] said that he had already spoke with the . . . Fort Worth people." [Petitioner] thought his confession was going to help "somewhat" with the Fort Worth investigation. However, he did not think the statements he made in the Fort Worth interview could be used against him in the Arlington interview. He said he thought he had to tell Sergeant Wright the same things he told Fort Worth police. He also "was very unsure about what was going on. [He] really didn't know the concept . . . so [he] was very unsure about the whole process."

[Petitioner] said that he did not realize that he was helping to build a case against himself when he made the waiver because the day before in Fort Worth, he was told that if he cooperated, they would work with him and that by being honest, they would go easy on him for punishment. If he had realized that he would be charged with aggravated robbery by the Arlington police, he would not have waived his rights.

According to [Petitioner], Sergeant Wright did not promise him anything, but "he kind of led [Petitioner] into believing that he had already spoke with Fort Worth, and that they had been working hand in hand." [Petitioner] never confessed to any of the Fort Worth robberies, however. He also did not believe he ever really confessed anything to Sergeant Wright. He said he had never been through an interrogation before and was confused. He said his questions to the officer about

3

whether he would be tried in Fort Worth or Arlington or whether he was going back to Fort Worth show his confusion about the Arlington interview and whether it was an extension of the Fort Worth interview.

**Audiotapes**

The audiotapes of [Petitioner]'s two interviews were played for the trial court. [Petitioner]'s answers in the tape of the Fort Worth interview are very difficult to understand. However, the officers' questions are easier to understand, and it is quite clear that they told [Petitioner] at the beginning of the interview that he was not in custody and that he was free to leave at any time. They also said the same thing later in the interview, towards the end. Although [Petitioner] did not admit to participating in robbing store clerks in several cities, he did over the course of the interview admit being in the car with two men whom the Fort Worth officers told [Petitioner] were involved in those robberies; [Petitioner] also admitted stealing cigarettes from some of those stores. However, throughout the interview, [Petitioner] denied knowing about or participating in any robberies at those same stores. Although the police focused primarily on what appear to be Fort Worth offenses, they did ask [Petitioner] about a 7-11 robbery in Arlington and told him they were going to show the pictures from that store to Arlington police "in the morning." Throughout the interview, Fort Worth police told [Petitioner] they knew he was one of the men in the video and that they thought he was just making bad decisions while under the influence of drugs.

Sergeant Wright started his interview with [Petitioner] by telling him that he had been working "real close with those Fort Worth guys" and that they told him [Petitioner] had been cooperative and wanted to get all this behind him. Sergeant Wright then asked [Petitioner] to talk to him, read [Petitioner] his *Miranda* warnings, asked if [Petitioner] would agree to talk to him, and had [Petitioner] sign and initial a waiver card saying [Petitioner] understood his rights. Sergeant Wright also told [Petitioner] that he did not know what was going on in Fort Worth, that he was not there to discuss it with [Petitioner], and that it was none of his business.

Sergeant Wright asked [Petitioner] about robberies at a QT and a 7-11 in Arlington. Although he showed [Petitioner] pictures, we cannot tell which stores were shown in the pictures. Sergeant Wright did tell [Petitioner] that based on the pictures [Petitioner] had looked at in Fort Worth (and had identified himself in), Sergeant Wright thought [Petitioner] was the person who robbed the clerks in Arlington. [Petitioner] admitted that the man in Sergeant Wright's pictures could have been him, but he told Sergeant Wright he was not sure if he had ever been in those stores. [Petitioner] identified his companion, Dre, in a picture when [Petitioner] and Sergeant Wright were discussing the 7-11 robbery.

When [Petitioner] did not say whether he had participated in the QT robbery,

4

Sergeant Wright told him he knew the man in the picture was him. Sergeant Wright told [Petitioner] that the clerk at the QT had identified him but that the clerk at the 7-11 could not. According to Sergeant Wright, there was no question that the man in the QT picture was [Petitioner] because the clerk could clearly see his face.

Sergeant Wright said he wanted to know why "they" had picked the QT and whether [Petitioner] intended to kill or hurt the clerk. In response to that question, about halfway through the interview, [Petitioner] said the gun was not loaded; he also told Sergeant Wright that Dre had dropped him off at the store, and he did not know why Dre picked certain stores. This was the first time in the interview with Sergeant Wright in which [Petitioner] admitted participating in the robberies. Sergeant Wright also told [Petitioner] that the clerk at the QT was distraught over the robbery and feared for his life. Sergeant Wright told [Petitioner] he wanted to be able to tell the clerk that the robbers did not intend to kill him, and [Petitioner] affirmed that he did not.

By the end of the interview, [Petitioner] had admitted his involvement in both offenses. Sergeant Wright thanked [Petitioner] for his cooperation and said that he would be able to reassure the QT clerk that the men did not intend to kill him that night and were not going to retaliate against him or his family. Sergeant Wright then asked [Petitioner] for a saliva sample for DNA testing; when [Petitioner] expressed confusion, Sergeant Wright told [Petitioner] he was not required to provide a sample voluntarily. After Sergeant Wright read [Petitioner] the consent form for the sample, and [Petitioner] acquiesced verbally, [Petitioner] asked what would happen if he waited until he had an attorney to find out what was the best thing to do. Sergeant Wright told [Petitioner] he was free to consult an attorney before giving a DNA sample. [Petitioner] then referred to the Fort Worth interview, and Sergeant Wright again explained to [Petitioner] that the Fort Worth offenses were separate and that he was interested only in the Arlington offenses. Upon [Petitioner]'s questioning about who would be responsible for prosecuting him, Sergeant Wright explained that Tarrant County would be responsible for prosecuting all of the cases and that they would probably be handled by one DA.

**Findings**

The trial court made the following oral findings on the record:

Article 38.22 of the Texas Code of . . . Criminal Procedure was complied with. The [Petitioner] was read his Miranda rights by Sergeant Wright. The [Petitioner] . . . initialed the card -- the warning card which contained the Miranda warning. Specifically, he was warned that he had the right to remain silent, not make any statements at all. And any statement he make -- may make would -- may be used against him at trial. Any statements you may make may be used as evidence against

you in court.

> He was advised, "You have the right to have a lawyer present to advise you prior to and during any questioning. If you are unable to employ a lawyer, you have the right to have a lawyer appointed to advise you prior to and during any questioning. You have the right to terminate the interview at any time."
>
> The statement given by the [Petitioner] was given to Officer Wright. This was recorded. The Miranda warning was recorded by Officer Wright also. The [Petitioner] knowingly, intelligently, and voluntarily waived any rights set out in the motion. The statement was recorded by a recording device that was capable of making an accurate recording, and I believe it was competent. And the recording is accurate and has not been altered. Voices on the recording were identified.
>
> The [Petitioner] was not promised anything as -- in order to induce him to make a statement. No threats were made to the [Petitioner], no promises. It was a completely voluntar[]y statement made by [Petitioner].
>
> The Court also finds that the [Petitioner] did not confess to Fort Worth police, and that he was not in . . . custody at the time because he was not under arrest. But in any event, no statement was made by [Petitioner] at that time.
>
> But the Court finds that in its totality, the action of officer -- or Sergeant Wright complied with 38.22; therefore, the Court will overrule your objection. State's Exhibit 5 will be -- which is the unredacted copy, will be admitted for record purposes only. State's Exhibit 6 [the redacted copy] will be admitted to the jury for all purposes. . . .

Mem. Op. 5-12, ECF No. 18-4 (footnotes omitted).

## II. ISSUES

In two grounds, Petitioner claims that (1) the state habeas court erred by not granting him an evidentiary hearing and (2) his ineffective-assistance-of-trial-counsel claims raised in his state habeas application have "merit as evidenced by counsel's conflicting response" to the state court. Pet. 6, 8, ECF No. 1.

## III. RULE 5 STATEMENT

Respondent believes that Petitioner has failed to exhaust his state court remedies as to the

6

claims raised and, thus, the claims are procedurally defaulted. Resp't's Answer 4, ECF No. 16.

## IV. EXHAUSTION AND PROCEDURAL DEFAULT

Applicants seeking habeas corpus relief under § 2254 are required to exhaust all claims in state court before requesting federal collateral relief. 28 U.S.C. § 2254(b)(1); *Fisher v. Texas,* 169 F.3d 295, 302 (5th Cir. 1999). The exhaustion requirement is satisfied when the substance of the federal habeas claim has been fairly presented to the highest court of the state, in this case the Texas Court of Criminal Appeals, on direct appeal or in state postconviction proceedings. *O'Sullivan v. Boerckel,* 526 U.S. 838, 842-48 (1999); *Fisher,* 169 F.3d at 302; *Carter v. Estelle,* 677 F.2d 427, 443 (5th Cir. 1982). The exhaustion requirement is "not satisfied if the petitioner presents new legal theories or factual claims in his federal habeas petition." *Reed v. Stephens,* 739 F.3d 753, 780 (5th Cir. 2014) (quoting *Anderson v. Johnson,* 338 F.3d 382, 386 (5th Cir. 2003)).

In his first ground for relief, Petitioner claims the state habeas court erred by not granting him an evidentiary hearing. This claim is raised for the first time in this federal petition. However, it is well settled that alleged errors in state habeas proceedings do not provide a basis for federal habeas relief. *See Trevino v. Johnson,* 168 F.3d 173, 180 (5th Cir. 1999); *Nichols v. Scott,* 69 F.3d 1255, 1275 (5th Cir. 1995). Therefore, Petitioner's first ground fails to state a claim, regardless of the exhaustion issue. Further, a paper hearing is sufficient to afford a petitioner a full and fair hearing, especially where, as here, the trial judge and the state habeas judge are one and the same. *Murphy v. Johnson,* 205 F.3d 809, 816 (5th Cir. 2000).

In his second ground, Petitioner claims his ineffective-assistance-of-counsel claims have "merit as evidenced by counsel's conflicting response to [the state habeas] court." Pet. 8, ECF No. 1. As supporting facts, Petitioner provides:

> The court summoned Petitioner's trial counsel, Lisa Hoobler, to respond to his allegations, however Attorney Hoobler failed to respond in a timely manner. Petitioner supplied the state court with documentation from Attorney Hoobler that contradicted Attorney Hoobler's statement to the court. The court ignored the "false" affidavit of Attorney Hoobler and denied Petitioner's motion(s) that clearly entitled him to the relief he is now seeking from this court.

*Id.*

This Court construes this claim as a claim that the state habeas court erroneously decided Petitioner's ineffective-assistance claims on state habeas review. Thus, although repackaged, Petitioner exhausted the claims by raising them in his postconviction state habeas application.

## V. DISCUSSION

### A. Legal Standard for Granting Habeas-Corpus Relief

A § 2254 habeas petition is governed by the heightened standard of review provided for in the Anti-Terrorism and Effective Death Penalty Act (AEDPA). 28 U.S.C. § 2254. Under the Act, a writ of habeas corpus should be granted only if a state court arrives at a decision that is contrary to or an unreasonable application of clearly established federal law as established by the United States Supreme Court or that is based on an unreasonable determination of the facts in light of the record before the state court. 28 U.S.C. § 2254(d)(1)-(2); *Harrington v. Richter,* 562 U.S. 86, 100 (2011). This standard is difficult to meet and "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Harrington,* 562 U.S. at 102. Additionally, the statute requires that federal courts give great deference to a state court's factual findings. *Hill v. Johnson,* 210 F.3d 481, 485 (5th Cir. 2000). Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct. A petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28

8

U.S.C. § 2254(e)(1); *Miller-El v. Cockrell,* 537 U.S. 322, 340 (2003); *Williams v. Taylor,* 529 U.S. 362, 399 (2000). Finally, when the Texas Court of Criminal Appeals denies a federal claim in a state habeas-corpus application without written order, a federal court may presume "that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary" and applied the correct "clearly established federal law, as determined by the Supreme Court of the United States," unless there is evidence that an incorrect standard was applied, in making its decision. *Johnson v. Williams,* 568 U.S. 1088, 1094 (2013); *Harrington,* 562 U.S. at 99; *Schaetzle v. Cockrell,* 343 F.3d 440, 444 (5th Cir. 2004).

**B. Ineffective Assistance of Trial Counsel**

Petitioner was represented at trial by Lisa Hoobler, who was assisted by Gerard Kardonsky. In the state habeas proceeding, the state construed Petitioner's ineffective-assistance-of-counsel claims, verbatim, are follows:

a. Counsel failed to ascertain whether the jurors were citizens of the United States of America;
b. Counsel failed to move to suppress the "process of identification";
c. Counsel failed to hire a "cross racial identification expert";
d. Counsel denied [Petitioner] his right to testify at trial and during punishment;
e. Counsel failed to challenge the [audio-taped] statement on the basis that [Petitioner] was under the influence of crack cocaine at the time he gave the statement;
f. Counsel failed to call Fort Worth Police officers to testify at the suppression hearing as to how they identified [Petitioner];
g. Counsel failed to ask the Arlington Police officer during the suppression hearing as to [Petitioner]'s state of mind during the interrogation;
h. Counsel failed to object to the trial court shifting the burden of proof to [Petitioner];
I. Counsel failed to highlight that Correa never identified [Petitioner];
j. Counsel never obtained a forensic expert to authenticate the audio tape of Wright's interrogation; and
k. Counsel failed to object to the jury charge not being in the record for appellate review.

9

State Habeas R. 70-71, ECF No. 18-26.

>Hoobler responded to the allegations in an affidavit, wherein she states:
>
>>I represented [Petitioner] in cause numbers 1147257, 1146943, 1147258, 1147551, 1147789, 1148816, 1149024. Cause number 1147257 was resolved at trial and all other causes were subsequently dismissed.
>>
>>[Petitioner] now complains that counsel was ineffective and each point shall be addressed below.
>>
>>1)  Counsel did not fail to ascertain whether jurors were citizens of the United States.
>>
>>Counsel was provided with and reviewed the juror information cards at the time of trial. The cards ask each juror if they are a citizen of the United States. Further, all venire members were asked during voir dire whether they met each qualification and all answered in the affirmative.
>>
>>2)  Counsel did not fail to move to suppress the process of identification.
>>
>>The identification of [Petitioner] was not in question in a manner that was appropriate for suppression. The Fort Worth officers obtained [Petitioner's] name as a person of interest while investigating another of the charges against [Petitioner]. Based on identifying evidence they were led to a witness that mentioned [Petitioner] by name as someone who had committed the offense. Officers contacted [Petitioner] and ask [sic] to come in and talk to them. He was not arrested and did not ask for counsel. [Petitioner] identifies himself to police on the audio recording made by Fort Worth officers. Due to the similarities of multiple robberies the Arlington detective then begins another investigation against [Petitioner]. [Petitioner] again identifies himself during a statement he made to the Arlington officer. The witness Correa at trial never made an out of court identification that needed to be suppressed or investigated. At trial Correa admitted he could not identify [Petitioner]. The only identification question at trial was for the jury to decide if [Petitioner] was in fact the person on the video tape of the incident. Therefore, there was no process of identification that was properly addressed by suppression.
>>
>>3)  Counsel did not fail to hire a cross racial identification expert.
>>
>>There was no identification for which an expert could have aided. The question of identification was not based on a single witness or a line up. The real question of identification was whether or not the statements made by [Petitioner] were admissions of guilt. Strategically, it was more important to focus on the

admissibility of [Petitioner's] own statements.

4)     Counsel did not deny [Petitioner] his right to testify at trial or punishment.

Counsel discussed on multiple occasions that [Petitioner] had the right not to testify against himself and could not be compelled to do so. Additionally, counsel informed [Petitioner] that it was his decision if he wanted to testify at trial or punishment. Counsel explained that he needed to consider that if he chose to testify he could be questioned about his priors and that there was always a risk of opening the door to questions about extraneous bad acts. There were several other robberies that [Petitioner] was suspected of participating in at the time of trial. [Petitioner] unequivocally stated to counsel on multiple occasions that he would not testify. [Petitioner] did decide that he would testify at the suppression hearing for the limited purpose of that hearing only. [Petitioner] was admonished on the record that he was not waiving his right not to testify by taking the stand for the suppression hearing outside the presence of the jury. [Petitioner] stated that he understood his rights.

[Petitioner] was also asked on the record if he understood his rights and if it was his choice not to testify on his behalf.

5)     Counsel did not fail to challenge any statements on the grounds that [Petitioner] was under the influence of crack cocaine.

[Petitioner] never informed counsel that he was under the influence of crack cocaine at the time of the interviews by police. Further, [Petitioner] was asked multiple questions at the suppression hearing that could have been answered responsively that he was under the influence of crack cocaine at the time, yet [Petitioner] never states that.

6)     Counsel did not fail to call Fort Worth police officers to testify at the suppression hearing as to how they identified [Petitioner].

How the Fort Worth officers identified [Petitioner] was not relevant to the suppression argument. [Petitioner] provided his name to the officers and stated it in the interview. Strategically, the best argument for the suppression was the legality of the interviews and the admissibility of [Petitioner's] statements. The relevant question was the two interview technique employed by the police and the extraneous statements that necessitated redactions. Counsel focused on legal arguments that had merit based on research and that would actually have affected the outcome of the trial. The identification of [Petitioner] was ultimately based on [Petitioner's] statements not why officers chose to question him initially.

7)     Counsel did not fail to ask the Arlington police officer as to [Petitioner]'s

11

state of mind.

Asking the officer what was [Petitioner's] state of mind would not be a proper question as it would call for speculation. However, counsel did ask questions of the Arlington officer that went to state of mind such as "he was upset wasn't he". Counsel also pointed out instances on the audio recording that demonstrate [Petitioner's] demeanor during the interview.

8) Counsel did not object to a shift of the burden of proof to [Petitioner].

Counsel is not aware of any un-objected to burden shift by the court. The Court specifically stated on the record that "the defense is under no obligation to present any witnesses or to present any testimony".

9) Counsel did not fail to highlight that Correa never identified [Petitioner].

Counsel highlighted that Correa could not identify [Petitioner] multiple times. Counsel established on cross that Correa could not identify or even remember the description he gave police on the night of the robbery or soon thereafter.

During closing both counsel Kardonsky and Hoobler highlighted that Correa could not identify [Petitioner].

10) Counsel did not fail to obtain a forensic expert to authenticate the audio tape of Wright's interrogation.

Counsel did consult with an expert audio engineer and obtained an analysis of all audio tapes provided by the state. Counsel watched a digital analysis that converted the tapes to visual wave files. The analysis showed that there were no gaps, no missing portions and no alterations.

11) Counsel did not fail to object to the jury charge not being in the appellant record.

It is not the responsibility of trial counsel to prepare the appellant record, nor can trial counsel object to something that may or may not occur in the future. Further, both the guilt/innocence and punishment charges are included in the clerk's record that is a part of the appellant [sic] record.

Additionally, counsel did file all relevant pre-trial motions, including two motions to suppress. Counsel did formulate a comprehensive defensive strategy and worked diligently to advance that strategy. Counsel spent over 76 hours in preparation of this trial and additional time investigating the six companion cases.

> [Petitioner] refused to cooperate and continuously confronted counsel with a hostile attitude. [Petitioner] withheld information from counsel such as his assertion he was high on crack cocaine and the names of potential witnesses.
>
> Despite [Petitioner's] attitude, counsel investigated and considered every piece of information given by [Petitioner] no matter how remote or improbable. There were multiple robberies committed by the same individuals and most were caught on video tape. The same vehicle was used multiple times. The various police departments compiled their information and eventually located the suspected vehicle. Inside the vehicle they found information leading to the named individual that told police [Petitioner] was one of the robbers. Counsel believes that the police had probable cause to question [Petitioner]. [Petitioner] went voluntarily to the initial interview before requesting counsel.
>
> Counsel did question the validity and admissibility of the interviews/interrogations. Counsel appropriately researched and argued and was overruled by the Court. Strategically, it was essential to eliminate or minimize the statements made by [Petitioner]. Counsel vigorously cross examined the Detective to attempt to show that [Petitioner's] statements were not a confession, however, the jury found that the state proved their case.
>
> At punishment counsel did call the only witness that [Petitioner] would consent to, his father-in-law. Counsel advised [Petitioner] that he had the option to stipulate to his priors which would prevent the state from going into details about the offenses. Counsel explained that if the state had to prove up the convictions it would just emphasize prior bad acts. Counsel reviewed the prior offenses and saw no reason the state would be unsuccessful proving up those priors. [Petitioner] made the choice to stipulate to the priors.
>
> I believe my trial and punishment strategies were successful because [Petitioner] was sentenced to less time than the co-defendant who pled open to the court and had equal or less culpability in the offenses. I was not ineffective in any way nor did I fail in any duty owed to my client.

*Id.* at 60-64 (record citations omitted).

A criminal defendant has a constitutional right to the effective assistance of counsel at trial. U.S. CONST. amend. VI, XIV; *Evitts v. Lucey,* 469 U.S. 387, 393-95 (1985); *Strickland v. Washington,* 466 U.S. 668, 688 (1984). To establish ineffective assistance of counsel a petitioner must show (1) that counsel's performance fell below an objective standard of reasonableness, and

(2) that but for counsel's deficient performance the result of the proceeding would have been different. *Strickland,* 466 U.S. at 688. Both prongs of the *Strickland* test must be met to demonstrate ineffective assistance. *Id.* at 687, 697. In applying this standard, a court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance or sound trial strategy. *Id.* at 668, 688-89. Judicial scrutiny of counsel's performance must be highly deferential and every effort must be made to eliminate the distorting effects of hindsight. *Id.* at 689. The Supreme Court recently emphasized in *Harrington v. Richter* the manner in which a federal court is to consider an ineffective-assistance-of-counsel claim raised in a habeas petition subject to AEDPA's strictures:

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland'*s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an unreasonable application of federal law is different from an incorrect application of federal law." A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

562 U.S. at 101 (quoting *Williams v. Taylor,* 529 U.S. 362, 410 (2000)) (emphasis in original). Accordingly, it is necessary only to determine whether the state courts' adjudication of Petitioner's ineffective-assistance claims was contrary to or an objectively unreasonable application of *Strickland. Bell v. Cone,* 535 U.S. 685, 698-99 (2002); *Kittelson v. Dretke,* 426 F.3d 306, 315-17 (5th Cir. 2005); *Schaetzle v. Cockrell,* 343 F.3d 440, 443 (5th Cir. 2003).

Based on the documentary record, counsel's affidavit, and his own recollection of the trial-court proceedings, the state habeas court found counsel's testimony and affidavit credible and

supported by the record and entered factual findings, too numerous to list here, refuting Petitioner's claims. State Habeas R. 71-77, ECF No. 18-26. Applying *Strickland* to the totality of counsel's representation, the state court concluded that Petitioner failed to prove that counsel was ineffective, that counsel's representation fell below an objective standard of reasonableness, or that there existed a reasonable probability that, but for counsel's alleged acts of misconduct, the result of his trial would have been different. *Id.* at 77-81. In turn, the Texas Court of Criminal Appeals denied habeas relief based on the state habeas court's findings.

Petitioner fails to rebut the state court's factual findings by clear-and-convincing evidence. See 28 U.S.C. § 2254(e)(1). Thus, the findings, including the court's credibility findings, are entitled to a presumption of correctness. *Richards v. Quarterman,* 566 F.3d 553, 563-64 (5th Cir. 2009); *Galvan v. Cockrell,* 293 F.3d 760, 764 (5th Cir. 2002). Applying the appropriate deference and having independently reviewed Petitioner's claims in conjunction with the state court records, the state courts' adjudication of Petitioner's claims was a reasonable application of *Strickland.* A petitioner shoulders a heavy burden to overcome a presumption that his counsel's conduct is strategically motivated, and to refute the premise that "an attorney's actions are strongly presumed to have fallen within the wide range of reasonable professional assistance." *Messer v. Kemp,* 760 F.2d 1080, 1090 (11th Cir. 1985). Overall, trial counsel devised a viable defense, filed pretrial motions, obtained a court-appointed investigator, appeared at pretrial hearings, conducted voir dire, made meritorious objections and motions during trial, cross-examined state witnesses, called a defense witness in the punishment phase, and gave closing arguments. A petitioner is required to demonstrate that counsel's performance, in light of the entire proceeding, was so inadequate as to render his trial unfair. *Washington v. Watkins,* 655 F.2d 1346, 1355 (5th Cir. 1981). Having reviewed

the entirety of the record, counsel's performance was well within the wide range of professionally competent assistance.

## VI. CONCLUSION

For the reasons discussed herein, Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is DENIED. Further, for the reasons discussed, a certificate of appealability is DENIED as Petitioner has not made a showing that reasonable jurists would question this Court's resolution of Petitioner's claims.

**SO ORDERED** on this 17th day of November, 2017.

_Reed O'Connor_
**UNITED STATES DISTRICT JUDGE**